CINCINNATI BELL TELEPHONE COMPANY, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES. (TWO CASES.)

OFFICE OF CONSUMERS' COUNSEL, APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as Cincinnati Bell Tel. Co. *v.* Pub. Util. Comm. (1984), 12 Ohio St. 3d 280.]

(Nos. 83-392, 83-733 and 83-1595—Decided July 25, 1984.)

*Messrs. Frost & Jacobs, Mr. Mark H. Longenecker, Jr., Mr. David C. Horn, Mr. Earl R. Huffman* and *Mr. William D. Baskett, III,* for Cincinnati Bell Telephone Co.

*Mr. Anthony J. Celebrezze, Jr.,* attorney general, *Mr. Robert S. Tongren, Mr. Jonathan L. Heller* and *Mr. Martin J. Marz,* for Public Utilities Commission.

*Mr. William A. Spratley,* consumers' counsel, *Ms. Janine L. Migden, Mr. Lawrence F. Barth* and *Mr. Bruce J. Weston,* for Consumers' Counsel.

*Messrs. Schneider, Prohaska & Sams* and *Mr. J. Raymond Prohaska,* urging reversal for *amicus curiae,* Ohio Telephone Assn. in case No. 83-392.

*Per Curiam.*

## Case No. 83-392

In its first three propositions of law, CBT challenges the validity of the commission's March 9, 1983 entry on rehearing whereby CBT was ordered to establish whole life depreciation schedules. CBT maintains that the right of state public utilities commissions to prescribe their own depreciation rates for intrastate ratemaking purposes was preempted by the FCC on January 6, 1983. On that date, the FCC released a memorandum opinion and order in *In re Amendment of Part 31,* 92 F.C.C. 2d 864, which reads in pertinent part as follows:

"The question presented in the reconsideration petition is a clearly delineated controversy over whether Section 220(b) [, Title 47, U.S. Code,] preempts state depreciation prescriptions that are inconsistent with the rates prescribed for classes of property by this Commission, or, whether Section 2(b)(1) [, Section 152(b)(1), Title 47, U.S. Code,] or Section 221(b) [, Title 47, U.S. Code,] reserve[s] to the states the right to prescribe their own depreciation rates for intrastate regulatory purposes." *Id.* at 867.

Continuing, the FCC made the following finding of fact in the preemption order:

"It is clear that unless telephone plants, including that portion subject to allocation to the intrastate jurisdiction, is depreciated at a reasonable rate, improperly timed capital recovery will occur. Indeed, in an increasingly competitive environment, it is possible that improper capital recovery could delay or prevent modernization which would add to the costs borne by ratepayers and could, ultimately, threaten carriers' ability to fully recover their invested capital. Moreover, the extent of state action attempting to prevent carriers from utilizing our depreciation prescriptions places substantial burdens on carriers and could well impair their ability to raise the investment capital they will need to fully compete in the continually evolving competitive telecommunications marketplace. Such a result could undermine the achievement of the Commission's objective to develop policies that will engender a dynamic, efficient telecommunications marketplace with services being provided at reasonable prices." *Id.* at 877.

The FCC then concluded that "* * * the most logical and reasonable interpretation of Section 220(b) of the * * * [Federal Communications Act of 1934] is that where the * * * [FCC] prescribes depreciation rates for classes of property, state commissions are precluded from departing from those rates." *Id.* at 879.

CBT initially argues that principles of *res judicata* prohibit the commission from deviating from the FCC's preemption order. CBT predicates this

argument on the commission's presence at the FCC proceeding which preceded the issuance of the preemption order and contends that *res judicata* can attach to an administrative proceeding.

CBT is correct in its assertion that *res judicata* can apply as a result of a prior administrative proceeding. *Superior's Brand Meats, Inc.* v. *Lindley* (1980), 62 Ohio St. 2d 133 [16 O.O.3d 150]. However, it is the nature of the administrative proceeding which is determinative of whether the doctrine applies. Generally, there are two types of administrative hearings — adjudicative and legislative. Under adjudicatory actions, *res judicata* will attach. However, where an administrative proceeding involves legislative or rulemaking functions, *res judicata* does not apply. *State Corp. Comm. of Kansas* v. *Wichita Gas Co.* (1934), 290 U.S. 561, 569.

The record demonstrates that the FCC order was promulgated under the guise of that agency's rulemaking authority. No hearings were conducted and no expert testimony was elicited. Instead, comments were simply filed for consideration by the FCC without cross-examination or confrontation. We conclude that the FCC order was legislative, as opposed to adjudicative, in nature and therefore *res judicata* is inapplicable.

Alternatively, CBT contends that the commission erred in failing to abide by the FCC's order, and that neither this court nor the commission has jurisdiction to review the order and rule on its validity. The federal circuit courts of appeals have authority to enjoin, set aside, suspend or to determine the validity of any order of the FCC. Section 2342, Title 28, U.S. Code. The commission, however, does not seek to have the subject order enjoined, suspended, set aside, or invalidated. This court does, however, have jurisdiction to review final orders of the Public Utilities Commission. R.C. 4903.13.

In *Southwestern Bell Tel. Co.* v. *Arkansas Pub. Serv. Comm.* (Mar. 30, 1984), E. D. Ark. No. LRC 84-247, unreported, the court was presented with facts closely analogous to the case at bar. Therein, Southwestern Bell sued for declaratory judgment and preliminary and permanent injunctive relief for the failure of the Arkansas Public Service Commission to prescribe depreciation rates in conjunction with the FCC preemption order. In granting summary judgment against Southwestern Bell, the court stated:

"* * * The Federal Communications Commission was established by the Communications Act of 1934, 47 U.S.C. § 151 *et seq.,* to regulate interstate and foreign communication. Congress expressly limited its jurisdiction, excluding regulation of intrastate communication. 47 U.S.C. § 152(b)(1). The FCC is authorized to determine depreciation rates for interstate carriers under 47 U.S.C. § 220(b). The FCC is authorized to exempt carriers such as the plaintiff from any of its accounting requirements where they are concurrently regulated by state regulatory commissions. 47 U.S.C. § 220(h). Within a nine month period, the FCC interpreted § 220(b) to deny its jurisdiction over establishing depreciation rates for intrastate ratemaking, and then to grant such jurisdiction. *Compare Amendment of Part 31,* 89 F.C.C. 2d 1094

(1982) with *Amendment of Part 31,* 92 F.C.C. 2d 864 (1983) ('Preemption Order').

"The Court has reviewed the FCC's analysis of the legislative history and is unpersuaded that the FCC has jurisdiction to determine intrastate depreciation methods. Although §220(b) is not expressly limited to interstate depreciation methods, this must be implied. The 1934 act left the door open for the FCC to ask Congress for additional authority under 47 U.S.C. §220(j). In light of the express FCC jurisdictional *limitations* imposed by Congress, the FCC's interpretation of expanding jurisdiction is a non sequitur. The logic of expanding into intrastate jurisdictional matters in the name of 'rapid, efficient, nation-wide, world-wide wire and radio communication service with adequate facilities at reasonable charges' could, theoretically, allow the FCC to bootstrap itself into preempting *all intrastate* ratemaking determinations. 92 F.C.C. 2d at 876 (citing 47 U.S.C. §151). If the FCC wishes to have this authority, it should seek express congressional approval. The Court finds the FCC preemption of intrastate depreciation methods to be ultra vires and will not enforce it for the plaintiff.

"Some mention has been made that only a court of appeals may invalidate an FCC order pursuant to 28 U.S.C. §2342. However, 28 U.S.C. §2342 is inapposite since this proceeding is not 'any proceeding to enjoin, set aside, annul or suspend any order' of the FCC, making 47 U.S.C. §402(a) applicable. Since the FCC is not a party, it will have not affect [*sic*] upon it. Further, determination of the issue is merely incidental to this lawsuit over which this Court has ample jurisdictional basis. If the FCC wishes to enforce its order, then it should take the appropriate steps."

We are in agreement with the court's analysis, and, accordingly, we conclude that the depreciation methodology adopted by the commission in its March 9, 1983 order on rehearing is reasonable and lawful.

CBT next argues that the commission erred when on rehearing it considered additional evidence concerning ENFIA usage when CBT and other parties to the rate case did not have an opportunity to present their positions concerning such additional evidence. Although ENFIA usage is within the jurisdiction of the FCC, this factor is nevertheless considered by the state utilities commissions for purposes of determining the appropriate separation factors to allocate the local exchange carrier's plant between intrastate and interstate jurisdictions. Accordingly, in its initial opinion and order, the commission adopted an ENFIA usage figure of 3,402 minutes. Subsequently, in its application for rehearing, OCC brought to the commission's attention a September 1982 FCC order modifying the ENFIA usage figure deemed appropriate for allocating separation factors from the 3,402 minutes level to 4,474 minutes. On rehearing, the commission took administrative notice of the revised FCC figure relating to ENFIA usage and adopted that figure without providing CBT an opportunity to present its position through additional testimony or cross-examination. As such, CBT contends the ENFIA modification was unlawful because no testimony was taken on the subject at

the rehearing. CBT was denied an opportunity to "explain or rebut" the September 1982 FCC order upon which the commission revised the ENFIA usage; nevertheless, CBT fails to explain how it has been prejudiced by the denial. Initially, CBT acknowledges that ENFIA service is within the FCC's jurisdiction. Additionally, although the FCC order was issued one month after the close of CBT's test year, it was made retroactive to May 1, 1982, clearly within the test year. Thus, even though CBT was unable to "explain or rebut" the latest figures upon which the commission based its ENFIA calculations, CBT was not shown to have been prejudiced thereby. In *Worthington Hills Civic Assn.* v. *Pub. Util. Comm.* (1976), 45 Ohio St. 2d 11, 12-13 [74 O.O.2d 40], this court stated that it " '* * * will not reverse an order of the commission as unreasonable or unlawful because of an error of the commission, if such error did not prejudice the party seeking such reversal.' *Cincinnati* v. *Pub. Util. Comm.* (1949), 151 Ohio St. 353 [39 O.O. 188], paragraph six of the syllabus."

CBT further argues that the commission's failure to adjust the cost of equity after it reversed its position on rehearing by adopting whole life depreciation as opposed to remaining life depreciation constitutes reversible error and violates due process of law. CBT predicates its argument on language which appears in the commission's initial opinion and order stating that the adoption of remaining life depreciation rates was a consideration in determining the rate at which to set the utility's cost of equity component.

Contrary to the contentions of CBT, the depreciation issue was the last of many considerations weighed by the commission when determining CBT's cost of equity. This is exemplified by the commission's initial opinion and order which provides in pertinent part:

"* * * [W]e have generally begun our deliberations [concerning cost of equity] at the midpoint of the range [between 14.59% and 15.55%], and then moved in one direction or another if the particular record under review evidences facts which we, in our discretion, believe should be taken into consideration. * * * A cost of equity lower than the midpoint is supported by the fact that Cincinnati Bell has an Aaa bond rating, has the highest stock safety and stability rating awarded by *Value Line*, has the second highest *Value Line* rating for overall corporate financial strength, does not rely upon frequent public stock offerings to generate funds, and will experience less risk in the future as a consequence of the enhanced possibility of all capital recovery resulting from the Commission's adoption of vintage group remaining life depreciation accrual rates. * * * Selecting a cost of equity above the midpoint, by contrast, is supported by the excellent service the Applicant provides and the uncertainty surrounding the impending divestiture. * * * After assessing these considerations, we believe that the factors justifying a cost of equity lower than the midpoint outweigh the countervailing factors. We accordingly find that * * * 14.83 percent, is the appropriate cost of equity."

"* * * [T]his court has consistently deferred to the expertise of the com-

mission in determining an appropriate rate of return unless such determination is 'manifestly against the weight of the evidence and * * * so clearly unsupported by the record as to show misapprehension or mistake or willful disregard of duty.' " *Consumers' Counsel v. Pub. Util. Comm.* (1980), 64 Ohio St. 2d 71, 79 [18 O.O.3d 302], quoting *C&SOE v. Pub. Util. Comm.* (1979), 58 Ohio St. 2d 120 [12 O.O.3d 122].

In the present cause, the commission's opinion and order weighs many factors in reaching CBT's cost of equity. Contrary to CBT's contentions, its cost of equity was not based solely upon the establishment of remaining life depreciation rates. Additionally, although CBT seeks to have this court order yet another hearing at which it could argue for a higher cost of equity as a result of the establishment of whole life depreciation rates, this precise argument was already placed before the commission by CBT at the initial hearing in this action. CBT argued that if remaining life depreciation rates were adopted, a lower rate of return would be necessary than if whole life depreciation rates were utilized. Given the commission's expertise in this area, coupled with its broad discretion, *Consumers' Counsel, supra,* it must be concluded that when whole life depreciation rates were adopted on rehearing, the commission appropriately weighed this adjustment against CBT's cost of equity and concluded that an adjustment was not necessary.

Finally, CBT argues that the commission erred when it failed to adjust the company's local service revenues in conjunction with the filing of updated materials.

Pursuant to R.C. 4901.13, the commission is empowered to promulgate rules to govern its proceedings and to regulate the mode and manner of all valuations, tests, inspections, investigations and hearings relating to parties who appear before it. Accordingly, the commission has adopted "Standard Filing Requirements" which provide in pertinent part:

" 'Projected test year data' — to comply with the statutory requirements regarding the test year, the utility may use estimated data in its application for an increase in rates. The utility *must* use at least three months actual data for the operating income statements. * * * A utility *may* also file an income statement based on six months actual and six months estimated data. The utility must also explain any material differences between the estimated and actual data. * * *" (Emphasis added.)

On November 6, 1981, CBT filed its notice of intent to file an application for an increase in rates, and the commission approved its request for a test year of twelve months ending August 31, 1982. On March 1, 1982, CBT filed its application based on four months of actual data and eight months of estimated data. On April 30, 1982, the company filed a revised schedule of local service revenues based on six months of actual data and six months of estimated data. CBT's April filing contained estimates that its local service revenues during the test year would be approximately $2,243,000 less than originally estimated. Therefore, CBT made the April filing to secure an adjustment for the projected decrease. The commission, while revising two

other aspects of CBT's revenues, refused to make the requested adjustment for a reduction in local service revenues. CBT maintains that the commission's refusal to effectuate the adjustment is unlawful and unreasonable.

CBT's primary contention is that pursuant to the Standard Filing Requirements the commission was obligated to make any and all revenue adjustments presented by the updated filing. The Standard Filing Requirements permit a public utility to file additional data with the commission for consideration in the rate case. However, nowhere do the requirements impose upon the commission a duty to adopt such data.

R.C. 4909.18 provides that at a hearing before a commission to determine a public utility's request for an increase in rates, "* * * the burden of proof to show that the proposals in the applications are just and reasonable shall be on the public utility." Thus, CBT had the burden to demonstrate to the commission that an adjustment was justified based on its estimates of a reduction in local service revenues.

CBT failed to sustain its burden of proof when it offered no testimony before the commission on the issue of its requested budget adjustment. In fact, the only evidence on this issue completely supports the commission's decision not to implement the requested adjustment. For instance, staff witness Deborah A. Hensel stated that CBT's proposed adjustment affected only one facet of its operations and that "[t]he Applicant has not proposed adjusting any other operating revenue classifications or operating expenses for budget revisions or to reflect actual data." Continuing, Hensel stated that "[t]he Staff is of the opinion that it is not appropriate to adjust only one segment of the budget without adjusting other areas * * * [and that] the Staff believes that a change in revenues would have a corresponding impact on operating expenses. * * *"

The commission's rejection of CBT's budget adjustment is supported by the testimony presented at the hearing. Therefore, since the commission's decision on this aspect of CBT's application is not manifestly against the weight of the evidence or so clearly unsupported by the record as to show misapprehension, mistake or willful disregard of duty, it should be affirmed. *Cleveland Elec. Illum. Co.* v. *Pub. Util. Comm.* (1975), 42 Ohio St. 2d 403 [71 O.O.2d 393], paragraph eight of the syllabus.

## Case No. 83-733

In this appeal, OCC challenges the commission's opinion and order authorizing CBT to expense seventy-five percent of its station connection charges and to capitalize the balance of such charges.

This precise issue was recently presented in *Consumers' Counsel* v. *Pub. Util. Comm.* (1984), 10 Ohio St. 3d 49, wherein the commission allowed Ohio Bell to expense seventy-five percent of its station connection charges and to capitalize the remaining twenty-five percent of such charges during the precise test year which also exists in the case at bar. This court reversed the

order of the commission and directed inclusion within the test year of only that portion of the station costs allowed under a prior commission directive.

Accordingly, we reverse the order of the commission *sub judice.*

### Case No. 83-1595

As a result of this court's issuance of a stay of the commission's March 9, 1983 opinion and order, the commission, by entry dated April 6, 1983, ordered CBT to maintain proper accounts pursuant to R.C. 4903.18, showing the excess amount rates actually being charged as a result of the stay. A hearing was held on April 25, 1983. Thereafter the commission issued an order again changing CBT's ENFIA usage figure. CBT applied for a rehearing which was granted in part and denied in part. It is from the denial of CBT's application for rehearing that the instant appeal arises.

In the hearing conducted pursuant to R.C. 4903.18, the commission again changed CBT's ENFIA usage figure. As previously discussed, the appropriate usage level for ENFIA was determined in the January 1983 opinion and order to be 3,402 minutes. In the commission's March 1983 entry on rehearing, the figure was changed to 4,474 minutes based upon a recent FCC order approving this level of ENFIA usage. On March 31, 1983, the FCC, upon reconsideration of its proceeding, revised ENFIA usage to 4,555 minutes, retroactively to May 1, 1982, which is well within CBT's test year.

In its first proposition of law, CBT challenges the commission's rejection of two exhibits as being hearsay. The exhibits, consisting of two letters written by FCC officials, were offered into evidence to clarify the FCC's position on ENFIA. CBT then embarks upon a lengthy argument contending that under Evid. R. 803 the documents were not inadmissible as hearsay.

In *Greater Cleveland Welfare Rights Org., Inc.* v. *Pub. Util. Comm.* (1982), 2 Ohio St. 3d 62, 68, this court addressed a similar contention as follows:

"We agree with appellants' contention that the commission is not stringently confined by the Rules of Evidence. The commission, however, is granted very broad discretion in the conduct of its hearings. *Elyria Telephone Co.* v. *Pub. Util. Comm.* (1953), 158 Ohio St. 441, 444 [49 O.O. 391]. Therefore, even if the commission did err in not overruling the hearing examiner's rulings striking portions of Stutz's testimony, it is well-settled that this court will not reverse an order of the commission because of an error * * * 'if such error did not prejudice the party seeking reversal.' *Cincinnati* v. *Pub. Util. Comm.* (1949), 151 Ohio St. 353 [39 O.O. 188], paragraph six of the syllabus. * * *"

The court concluded in viewing the totality of the evidence that appellants had not been prejudiced as a result of the commission's evidentiary rulings. Likewise, in the present cause CBT failed to show it had been prejudiced when the commission adhered to an FCC ruling, the subject matter over which the parties concede the FCC has exclusive jurisdiction.

CBT next argues that the commission's increase of ENFIA usage from 3,402 minutes to 4,555 minutes unreasonably and unlawfully "unfreezes" its

subscriber plant factor ("SPF"). SPF is a factor utilized by the commission to allocate a utility's investment in station equipment, subscriber lines and non-traffic sensitive portion of office equipment between interstate and intrastate jurisdiction. In February 1982, the FCC froze SPF factors at average 1981 levels as of April 1, 1982. CBT contends that as a result of the commission's decision to increase ENFIA usage from 3,402 minutes to 4,555 minutes, its frozen SPF value has effectively been changed. A review of the record, however, reveals that the evidence before the commission does not support CBT's argument.

The evidence demonstrates that although SPF factors were frozen by the FCC, CBT has been incorrectly computing its SPF factor based upon 3,402 minutes, when its actual ENFIA usage totaled nearly 8,300 minutes. During this same period of time, American Telephone & Telegraph Company prepared a nationwide study revealing that average ENFIA holding times exceed 6,000 minutes.

In light of the evidence that CBT's actual ENFIA usage totaled nearly 8,300 minutes, and the FCC's recent ENFIA revisions, the commission concluded the CBT has been incorrectly computing its SPF based upon erroneous ENFIA calculations. Accordingly, the commission did not "unfreeze" CBT's SPF factor; instead, it merely adjusted it to accurately reflect the figure which should have been employed.

Finally, CBT seeks to raise objections to the commission's treatment of two accounts involving separation factors for accumulated deferred income taxes and depreciation. The record demonstrates that CBT's objections date back to August 30, 1982, the date on which the commission's staff released its report. Pursuant to R.C. 4909.19, any party having objections to the commission's staff report must file these objections within thirty days of its release. Although CBT did file objections to the staff report, it did not object to the treatment of separation factors applied to its accumulated deferred income tax and depreciation accounts. Again, in its application for rehearing of the commission's initial order released in January 1983, CBT did not voice any objections to the separation factors set forth in the staff report, or their treatment by the commission in its order.

R.C. 4903.10 provides in pertinent part:

"After any order has been made by the public utilities commission, any party who has entered an appearance in person or by counsel in the proceeding may apply for a rehearing in respect to any matters determined in said proceeding. Such application shall be filed within thirty days after the entry of the order upon the journal of the commission.

"* * *

"Such application shall be in writing and shall set forth specifically the ground or grounds on which the applicant considers said order to be unreasonable or unlawful. No party shall in any court urge or rely on any ground for reversal, vacation, or modification not so set forth in said application." (Emphasis added.)

It is well-established that "[t]he filing of an application for rehearing before the Public Utilities Commission is a jurisdictional prerequisite to an error proceeding from the order of the Commission to this Court, and only such matters as are set forth in such application can be urged or relied upon in an error proceeding in this Court." *Travis* v. *Pub. Util. Comm.* (1931), 123 Ohio St. 355, paragraph six of the syllabus. See, also, *Communications Workers* v. *Pub. Util. Comm.* (1979), 57 Ohio St. 2d 76, 77 [11 O.O.3d 244]. CBT, having failed to comply with either R.C. 4909.19 or 4903.10, may not now pursue an argument which procedurally should have been an issue in case No. 83-392.

All aspects of the commission's opinions and orders in case Nos. 83-392 and 83-1595 are reasonable and lawful, and the orders are therefore affirmed.

The order of the commission in 83-733 is unreasonable and unlawful and is therefore reversed.

The funds deposited in trust shall be distributed similar to the manner provided in *Columbus & Southern Ohio Elec. Co.* v. *Pub. Util. Comm.* (1984), 10 Ohio St. 3d 12, 16. The funds deposited pursuant to the stay granted on March 16, 1983, as subsequently modified, with interest collected thereon, shall be distributed to CBT's customers pursuant to R.C. 4903.19, upon approval by the court of the trustee's plan for distribution. The trustee is hereby authorized and directed to immediately take all steps necessary to prepare a plan for the distribution of the funds held pursuant to the stay order. The plan shall be submitted to the court for approval within forty-five days of this order and shall provide that distribution be made within ninety days of this order. CBT is ordered to cooperate with the trustee and provide all information the trustee deems necessary to effectuate compliance with this order.

*Orders affirmed in
case Nos. 83-392 and 83-1595.
Order reversed in
case No. 83-733.*

CELEBREZZE, C.J., SWEENEY, C. BROWN and J. P. CELEBREZZE, JJ., concur.

CELEBREZZE, C.J., concurs separately.

LOCHER, J., concurs in judgment only.

W. BROWN and HOLMES, JJ., dissent.

CELEBREZZE, C.J., concurring. I concur with the judgment and rationale of the majority opinion. I write separately, however, to emphasize that

federal preemption of matters traditionally subject to state regulation will not be presumed in the absence of specific congressional intent.

If the federal judiciary decides that federal preemption of the power to fix depreciation rates for state ratemaking purposes is required as an incident to divestiture and is committed to enforcing it, so be it. However, such a radical change in policy is not, contrary to the implicit suggestion of the dissenters, to be presumed from the adoption of a regulation by the FCC. On the contrary, it is the view of a majority of this court that such a radical departure from the traditional interpretation of Sections 152(b)(1), 220(b), and 221(b), Title 47, U.S. Code requires specific congressional intent or at least a specific judicial declaration, binding upon this court, that such an interpretation is now mandated as the result of modern developments in the telecommunications industry.

For the same reasons, I cannot agree with the dissenters that a rehearing in this court or continuance of the stay will resolve the question. The salient facts will remain the same — prior to January 6, 1983, the Public Utilities Commission of Ohio prescribed depreciation rates for intrastate ratemaking purposes without objection from the federal sector; since that date, the FCC has issued a ruling that the identical statutes now require federal preemption, the validity of which has been upheld by the Fourth Circuit Court of Appeals upon its finding that it will facilitate divestiture.

The unanswered question is whether that FCC rule will be enforced against the states so as to preempt the states' power to fix depreciation allowances in telecommunications cases. This court is without jurisdiction to make that essential determination and, accordingly, the majority's decision is based upon the fact that the commission's order is in conformity with Ohio's ratemaking statutes.

Unlike the dissenters, I do not believe that CBT will be irreparably harmed by our decision today. If enforcement of the FCC order is sought, procedures are available to CBT to obtain a stay of execution pending any further litigation.

Neither the telecommunications industry nor the consumers are well-served by an ambiguous deregulation policy. Similarly, neither the states nor the federal government is well-served by an ambiguous preemption policy. Application of traditional preemption principles herein would leave the state's regulatory power intact. If policy requires federal preemption of state regulation of the telecommunications industry, Congress should make it explicit.

WILLIAM B. BROWN, J., dissenting. I disagree with the majority's position for two primary reasons. First, the majority has failed to acknowledge that the parties in this action, along with other state utility commissions and public utility companies, were just recently involved in an action in the United States Court of Appeals, Fourth Circuit, wherein that court upheld

the lawfulness of the FCC preemption order.[3] See Sections 2342 *et seq.*, Title 28, U.S. Code. Inasmuch as the federal circuit courts of appeals have exclusive jurisdiction in this area and, inasmuch as the resolution of that action has a direct and substantial impact on the outcome of this case, this court would be well-advised to set this cause for rehearing to allow the parties to rebrief and reargue orally the merits of this cause in light of the decision rendered by the federal court.

Secondly, the lifting of the stay and the concomitant release of the funds accumulated in this case at this time are unnecessary. Since March 9, 1983, the date when the commission ignored the FCC preemption order and proceeded to order CBT to instead utilize whole life depreciation accrual schedules, a stay has been in effect pursuant to this court's authority under R.C. 4903.16. By order of this court and in accordance with this stay, CBT has deposited over $13,000,000 into a trust account (see R.C. 4903.18), the vast majority of which represents the difference between depreciation rates prescribed by the commission and those ordered to be implemented by the FCC. This stay and the establishment of the trust account adequately protect both the public's interest in this case as well as CBT's. Nevertheless, the majority, in callous disregard of the decision released by the Fourth Circuit, has ordered the disbursement of this money to CBT's customers at this time. Since the FCC order was upheld by the Fourth Circuit, the release of this money at this point in time could irreparably harm CBT. Accordingly, in view of the fact that the stay currently in effect adequately protects both the interests of CBT and its customers, I would extend the stay pending rehearing of this cause before this court.

HOLMES, J., dissenting. While I agree with Justice William Brown's opinion above, I write to voice my disagreement with other conclusions reached by the majority.

In case No. 83-392, the commission erred on rehearing when it considered additional evidence with respect to ENFIA usage and did not allow CBT to present rebutting evidence concerning the usage. This court has already held that such procedure is incorrect. In *Forest Hills Utility Co.* v. *Pub. Util. Comm.* (1974), 39 Ohio St. 2d 1 [68 O.O.2d 1], the court examined a commission's ruling in which the commission took administrative notice of a utility's cost for the purpose of rate base considerations. The cost analysis was not available at the initial hearing and the utility was not given an opportunity to explain or rebut the figures. This court reversed the commission and stated that " '[e]ven though an administrative authority has statutory power to make independent investigations, it is improper for it to base a decision or findings upon facts so obtained, unless such evidence is introduced at a hearing or otherwise brought to the knowledge of the interested parties prior to decision, with an opportunity to explain or rebut.' " See, also, Annotation (1951), 18 A.L.R. 2d 552, and cases cited therein.

---

[3] Case No. 83-1136, argued October 7, 1983, released June 19, 1984.

By failing to recognize *Forest Hills,* the majority establishes the precedent to allow the commission to take administrative notice of facts which are subject to dispute. Now the commission can effectively preclude a party from demonstrating the unworthiness of the evidence in question. In my view, taking administrative notice of facts without permitting an opposing party the opportunity to explain or rebut such evidence is a denial of a fair hearing and due process.

As to the issue of expensing station connection charges within case No. 83-733, see my dissenting opinion in *Consumers' Counsel* v. *Pub. Util. Comm.* (1984), 10 Ohio St. 3d 49, 51.

In case No. 83-1595, the commission clearly abused its discretion when it ruled that two letters written by FCC members were inadmissible as hearsay. While the commission is not stringently confined to the Rules of Evidence in admitting evidence during an administrative proceeding, the rules do provide excellent criteria to guide the commission's discretion.

Evid. R. 803(8) sets forth the hearsay exception for public records and reports. In essence, a report is admissible under the rule if the official making the statement has a legal duty to report the matters contained in the document. The FCC officials who wrote the correspondence were duly authorized to engage in the activity, and the statements contained in the letters clarified the position of the FCC in matters relating to this appeal. Furthermore, one letter had an additional element of reliability as it was published in the Federal Register under the mandates of Section 552(a)(1)(D), Title 5, U.S. Code.

CBT has been prejudiced due to the commission's evidentiary rulings as it has not been afforded the opportunity to sufficiently address the subscriber plant factor issue. The FCC had already interpreted the factor. However, from the record it is apparent that the commission refused to consider this interpretation. CBT was thereby precluded from demonstrating the FCC's view that the freezing of the subscriber plant factor permits corresponding fluctuation in the MTS/WATS or ENFIA factors to maintain an overall freeze. I believe the FCC interpretation was certainly relevant to this issue and the commission committed error in its refusal to consider such evidence.

Accordingly, I would extend the stay order pending a rehearing in case No. 83-392 to determine the lawfulness of the FCC preemption in light of the Fourth Circuit Court of Appeals' decision, and reverse the rulings made by the commission as to the foregoing issues.